# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**CHRISTOPHER THOMAS NATALE,**          Chapter 11
    Debtor                              Case No. 12-13532-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**LOWELL DEVELOPMENT AND FINANCE
CORPORATION,**
    Plaintiff
v.                                       Adv. P. No. 13-1378
**WINTER HILL BANK, FSB f/k/a
WINTER HILL FEDERAL SAVINGS
BANK,**
    Defendant
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matters before the Court are Cross-Motions for Summary Judgment with respect to the "First Amended Complaint to Determine the Nature and Validity of Lien" filed by Lowell Development and Finance Corporation ("LDFC"). Through its Complaint and Motion for Summary Judgment, LDFC seeks a declaratory judgment that its second mortgage on property located at 338 Market Street in Lowell, Massachusetts has priority over the deficiency claim of the defendant, Winter Hill Bank, with respect to obligations secured by its first mortgages on properties located at 30-36 and 38 Gorham Street in Lowell - - obligations which are purportedly cross-collateralized pursuant to a dragnet clause contained in Winter Hill Bank's first mortgage on 338 Market Street. The Court heard the

1

Cross-Motions on February 12, 2014 and took the motions under advisement. The issue presented is whether Winter Hill Bank has enforceable dragnet clauses and cross-collateralization provisions in its mortgages such that any deficiency with respect to its first mortgages on one group of properties located on Gorham Street in Lowell are secured by the value of the Market Street property, although the result would be that the second mortgage of LDFC on the Market Street property would be partially or wholly unsecured. Stated another way, Winter Hill Bank and LDFC disagree as to whether the equity in the Market Street property is available to Winter Hill Bank to cover its projected deficiencies in the values of the Gorham Street properties.

The parties agree that the material facts necessary to determine the Cross-Motions are not in dispute. Accordingly, summary judgment is appropriate. *See* Fed. R. Civ. P. 56(a), made applicable to this proceeding by Fed. R. Bankr. P. 7056. The Court now makes its findings of fact and rulings of law in accordance with Fed. R. Bankr. P. 7052.

## II. BACKGROUND

Christopher Thomas Natale (the "Debtor") filed a voluntary Chapter 11 petition on April 26, 2012 together with Schedules of Assets and Liabilities, a Statement of Financial Affairs and other required documents. On Schedule A-Real Property, the Debtor listed the following properties: 927 Franklin Street, Melrose, Massachusetts, 785 Merrimack Street, Lowell, Massachusetts, 295 Dutton Street, Lowell, Massachusetts, 586 Merrimack Street, Lowell, Massachusetts, 338 Market Street, Lowell, Massachusetts (also known as 338-340 Market Street), 30 Gorham Street, Lowell, Massachusetts (also known as 30-36 Gorham

Street), and 38 Gorham Street, described as an adjacent parking lot to 30 Gorham Street

contaminated with environmental hazards. The Debtor ascribed a total value to the

properties of $2.66 million. On Schedule D-Creditors Holding Secured Claims, the Debtor

listed numerous secured creditors, including Winter Hill Bank with a first mortgage on 338

Market Street and a first mortgage on 30 Gorham Street and 38 Gorham Street.[1] He did not

initially list LDFC on Schedule D, although Eastern Bank appears to have serviced its loans

and was listed as holding the following mortgages: 1) a second mortgage on 295 Dutton

Street; 2) a third mortgage on 295 Dutton Street; 3) a second mortgage on 586 Merrimack

Street; 4) a second mortgage on 338 Market Street; and 5) a second mortgage on 30 Gorham

Street and 38 Gorham Street. On March 6, 2013, the Debtor filed an Amended Schedule D

to list LDFC as the holder of second mortgages on 295 Dutton Street, 586 Merrimack Street,

338 Market Street, and 30 and 38 Gorham Street.

In January and February of 2013, the Debtor filed several motions, which he

subsequently amended, to determine secured status, including motions relating to 338

Market Street and the Gorham Street properties. The Debtor's motions to determine secured

status elicited objections from Winter Hill Bank and LDFC. Additionally, on August 15,

2013, LDFC filed a Motion to Determine the Validity, Priority and Extent of Lien to which

Winter Hill Bank objected. On September 4, 2013, the Court denied LDFC's Motion without

---

[1] He also listed the Winter Hill Bank on Schedule F-Creditors Holding Unsecured
Nonpriority Claims with claims in the sum of $573,930.05 and $95,089.00 relating to the
foreclosure of first and second mortgages on property located at 401 Bridge Street,
Lowell, Massachusetts.

prejudice to the commencement of an adversary proceeding. In accordance with the Court's ruling, LDFC filed a Complaint on September 24, 2013, which it later amended on October 7, 2013. Winter Hill Bank filed an answer and a counterclaim seeking a declaration that its first mortgages on the Market Street and Gorham Street properties are cross-collateralized and that they have priority over LDFC's second mortgages on those properties such that Winter Hill Bank can collect any unsecured deficiency on the Gorham Street mortgage from the Market Street property prior to LDFC's ability to collect on its mortgages. Pending resolution of the adversary proceeding, the parties stipulated that the value of 338 Market Street is $805,000 and that the value of 30-36 Gorham Street and 38 Gorham Street is $470,000.00.

## III. FACTS

On January 17, 2003, Winter Hill Bank issued a Commitment Letter to the Debtor for a loan in the principal amount of $787,500, which the Debtor accepted and signed on January 27, 2003. On February 5, 2003, Winter Hill Bank loaned the Debtor the sum of $787,500 in connection with the purchase of the property located at 338 Market Street. The loan was evidenced by a note secured by a first mortgage on 338 Market Street, both of which were executed by the Debtor, individually. The mortgage provides in pertinent part that it secures repayment of the note and, in addition, provides the following definitions:

> <u>LOAN DOCUMENTS</u> The NOTE (the Guaranty) as it may be amended, extended or renewed and any mortgage, security agreement, assignment of leases and rents, loan agreement or other agreement heretofore, *now or hereafter executed* to secure, or entered into otherwise in connection with the NOTE (the Guaranty), including without limitation this Mortgage and Security Agreement.

4

> OBLIGATIONS  Payment of the PRINCIPAL, with INTEREST and all other
> charges evidenced by or becoming due and payable to the LENDER under the
> NOTE (the Guaranty)[,] this Mortgage and Security Agreement or any other
> Loan Documents; payment and performance of all obligations, covenants and
> agreements of the BORROWER to the LENDER contained in the NOTE (the
> Guaranty) and all other Loan Documents; and payment and performance of
> all other obligations of the Borrower to the Lender, *now existing or hereafter
> arising, direct or indirect, absolute or contingent.*

The mortgage also provides the following:

> For valuable consideration paid, the BORROWER grants to the LENDER, its
> successors and or assigns, with offices at 342 Broadway, Somerville, MA 02145,
> with THE MORTGAGE COVENANTS, the Mortgaged Property, including all
> tenements, hereditaments and appurtenances and the rents, income and
> profits thereof, to secure the OBLIGATIONS of the BORROWER to the
> LENDER.

(emphasis supplied).  Winter Hill Bank also holds a Collateral Assignment of Rents and

Other Rights with respect to 338 Market Street, recorded in the Middlesex North District

Registry of the Land Court.

Approximately six months after the Debtor granted Winter Hill Bank a mortgage on

the 338 Market Street property, LDFC, on August 15, 2003, loaned the Debtor the sum of

$250,000. Its loan was evidenced by a note, which was secured by a second mortgage on the

338 Market Street property granted by the Debtor. The mortgage was captioned "Mortgage

Deed (Subordinate to Prior Mortgage)" and provides: "This Mortgage is subject to a prior

mortgage to Winter Hill Federal Savings Bank (the "First Mortgagee") which mortgage is in

the face amount of $787,500 dated February 5, 2003. . . . "

On May 19, 2006, Winter Hill Bank issued a Commitment Letter for a loan in the

principal amount of $727,500, which Commitment Letter was accepted and signed on May

26, 2006 by the Debtor.[2]  This loan was an apparent refinancing of a 2005 obligation of the

Debtor to Winter Hill Bank with respect to prior mortgages granted on 30-36 and 38 Gorham

Street.[3]  The Commitment Letter contained a section entitled "Cross Collateralization" which

provides: "Any mortgage or other instrument of security given to secure the Borrower's

obligations under this loan shall also secure any extensions, renewals or modifications of the

loan and any other obligations or liabilities of the Borrower whether now in existence or

hereafter arising." On May 26, 2006, Winter Hill Bank loaned Mill Street Properties, LLC,

whose sole owner and manager was the Debtor, the sum of $727,500 in connection with 30-36

and 38 Gorham Street. The loan was evidenced by a note executed by Mill City Properties,

LLC, secured by a mortgage on 30-36 Gorham Street granted by Mill City Properties, LLC

and a mortgage on 38 Gorham Street granted by the Debtor, d/b/a/ Mill City Properties.

The Debtor also executed a personal Guaranty of Mill City Properties, LLC's obligations

under the loan.  Winter Hill Bank's mortgages regarding the Gorham Street properties at

Section 2-1, captioned "Security Interest," provides:

> To secure the Mortgagor's prompt, punctual, and faithful payment and
> performance of all and each of the present and future Liabilities to the
> Mortgagee, including, without limitation, those arising under the Note and the
> Loan Agreement, the Mortgagor hereby grants to the Mortgagee a continuing
> security interest in and to, and assigns to the Mortgagee, the Collateral (as that
> term is defined in section 3-3 herein)."

The mortgage contains the following definition of Collateral:

---

[2] As discussed below, the loan was actually made to the Debtor's affiliate, Mill
City Properties, LLC, a Delaware limited liability company.

[3] These 2005 mortgages were discharged by Winter Hill Bank on May 30, 2006.

"Collateral' shall include all and each of the following, whether singly or collectively, whether real property, personal property, or a combination thereof, whether now owned or now due or now existing, or in which the Mortgagor has an interest, or hereafter, at any time in the future, acquired, arising, or to become due, or in which the Mortgagor obtains an interest, and all proceeds, products, substitutions, and accessions of or to any of the following: . . .

(i) any other property of the Mortgagor in which the Mortgagee may in the future be granted an interest. . . .

The mortgages contain the following language in Article 9-18, captioned "Intent": "the interests created by this Agreement secure all of the Liabilities of the Mortgagor to the Mortgagee, whether now existing or hereafter arising." Winter Hill Bank also holds a Collateral Assignment of Rents and Other Rights recorded in the Middlesex North District Registry of Deeds.

Approximately four months after granting Winter Hill Bank mortgages on the Gorham Street properties, on September 5, 2006, Mill City Properties, LLC borrowed $50,000 from LDFC with respect to the 30-36 Gorham Street property. The loan was evidenced by a note secured by a second mortgage on 30-36 Gorham Street, dated September 5, 2006, granted by Mill City Properties, LLC. On the same date, the Debtor, d/b/a Mill City Properties also granted LDFC a second mortgage on 38 Gorham Street. Both mortgages were captioned "Mortgage Deed (Subordinate to Prior Mortgage)" and provide: "This Mortgage is subject to a prior mortgage to Winter Hill Federal Savings Bank (the "First Mortgagee") which mortgage is in the face amount of $727,500 dated May 26, 2006. . . . "

On April 28, 2011, Winter Hill Bank, the Debtor, and Mill City Properties, LLC entered into forbearance agreements in an effort to restructure the debt obligations with respect to

7

the Market Street and Gorham Street loans.  In connection with the forbearance agreements,

Winter Hill Bank executed amendments to its mortgages on the Market and Gorham Street

properties, which were recorded in the Middlesex North District Registry of the Land Court.

The amendment affecting the Market Street mortgage, executed by the Debtor on May 5,

2011,[4] contained an outline of the "Mill City Obligations."  The Obligations are described as

follows:

> Any and all obligations owing by Mill City [Properties, LLC] to the Bank,
> including without limitation, the loan arrangements entered into by Mill City
> and the Bank in the original principal amount of $727,500.00 as evidence by
> various documents, including without limitation, a Mortgage Note dated
> Mary [sic] 26, 2006 (the "**Mill City Note**"), a Mortgage Security Agreement
> and Assignment dated May 26, 2006 secured by property located at 30-36
> Gorham Street, Lowell Massachusetts 01852 (the "**Mill City 30-36 Property**")
> as recorded in the Middlesex North District Registry of Deeds . . .(the "**Mill
> City Mortgaged Property**"), together with a Collateral Assignment of Rents
> and Other Rights between the Bank and Mill City . . . .

The Amendment also provides that the term "<u>Obligations</u>" was amended to add the

following clause at the end of the sentence:

> . . . payment of the principal, with interest and all other charges evidenced by
> or becoming due and payable to the Bank under the Mill City Obligations, or
> any other Mill City loan or agreement as executed with the Bank; payment and
> performance of all obligations, covenants and agreements of Mill City to the
> Bank contained in the Mill City Obligations, and all other Mill City Loan
> Documents; and payment and performance of all other obligations of Mill City
> to the Bank, now existing or hereafter arising, direct or indirect, absolute or
> contingent, including without limitation, the Mill City Obligations.

On May 5, 2011, Mill City Properties, LLC and the Debtor, d/b/a Mill City Properties

---

[4] The amendments contained an effective date of April 28, 2011, but the
signatures were notarized on May 5, 2011.

8

executed amendments to Winter Hill Bank's mortgages on 30-36 Gorham Street and 38 Gorham Street. The amendment to the 30-36 Gorham Street mortgage defined the "Natale Obligations" with reference to the February 5, 2003 loan documents pertinent to 338 Market Street and the May 26, 2006 loan documents pertinent to 38 Gorham Street and amended the May 26, 2006 mortgage on 30-36 Gorham Street to include the Debtor's obligations to Winter Hill Bank as part of the definition of "Liabilities" in Article 3-1. Similarly, the mortgage on 38 Gorham Street was amended to include the Mill City Obligations in the definition of "Liabilities."

The total amount outstanding on the Winter Hill Bank note secured by the 338 Market Street property is $604,478.98;[5] the total amount presently outstanding on the 338 Market Street second mortgage with LDFC is approximately $210,000.[6] The Stipulated value of 338 Market Street is $805,000.

The total amount outstanding on the Winter Hill Bank note secured by the Gorham Street properties is approximately $615,434.14.[7] The total amount presently outstanding on the 30-36 Gorham Street second mortgage with LDFC is approximately $50,000.[8] The stipulated value of 30-36 and 38 Gorham Street for the purposes of this proceeding, is $470,000.

---

[5] *See* Winter Hill Bank's Statement of Undisputed Material Facts.

[6] *See* LDFC's Memorandum in Support of its Motion for Summary Judgment.

[7] *See* Winter Hill Bank's Statement of Undisputed Material Facts.

[8] *See* LDFC's Memorandum in Support of its Motion for Summary Judgment.

The order of priority as between LDFC and Winter Hill Bank is tied to the market values of the properties located at 338 Market Street, 30-36, and 38 Gorham Street, which are insufficient to satisfy all of the liens of the parties which encumber the properties. The property at 338 Market Street, based upon the agreed value of $805,000, appears to have sufficient value to completely satisfy Winter Hill Bank's first mortgage of approximately $604,000, and partially satisfy LDFC's second mortgage, leaving it with a deficiency of approximately $10,000, assuming Winter Hill Bank's position were determined to be without merit. If Winter Hill Bank's dragnet clause is given effect, however, LDFC would only be able to recover approximately $55,000 with respect to its second mortgage on 338 Market Street as Winter Hill Bank could recover its deficiency of approximately $145,000 from the Gorham Street properties from the Market Street property. Thus, Winter Hill Bank could look to the 338 Market Street property to satisfy its potential deficiency claims with respect to the Gorham Street properties, priming LDFC's second mortgage on Market Street, and leaving LDFC unable to satisfy its second mortgage of approximately $210,000 on that property in full.

In conjunction with the relevant loan documents, Winter Hill Bank submitted portions of a transcript from the deposition of the Debtor, as well as the affidavit of Kevin Gatlin, Vice President of Winter Hill Bank ("Gatlin"). The Debtor testified at his deposition that the Market Street and Gorham Street properties were blighted when he acquired them and "off the tax rolls" and that LDFC offered a "kind of stimulus program" to rehabilitate the properties. He testified that he understood that Winter Hill Bank's mortgages were cross-

collateralized, stating "[i]n layman's terms, when I cross-collateralized the two properties,

I'm obligated to Winter Hill on both properties as one mortgage amount, so to speak." He

stated that he understood that the mortgage provisions would allow Winter Hill Bank in the

case of default on one property to collect from the collateral on the other property. The

Debtor testified that he disclosed Winter Hill Bank's first mortgage on the Market Street

property to LDFC, as well as Winter Hill Bank's first mortgage on the Gorham Street

properties. According to the Debtor, the purpose of the 2011 amendments was to "get me

back on track with Winter Hill Bank" after he fell behind on his mortgage payments.

> In his affidavit, Gatlin stated:
>
> It was always the intent of Winter Hill Bank as far back as the time Debtor
> applied for his first mortgage with Winter Hill regarding said properties [the
> Market Street and Gorham Street properties], and through the entire loan
> process, that all of Debtor's said properties, whether held at the time of that
> first mortgage application, or thereafter acquired anytime in the future, would
> be cross-collateralized to ensure that, in the situation where one of Debtor's
> properties did not have enough equity to cover the loan amount, Winter Hill
> could collect the deficiency from another property owned by Debtor for which
> Winter Hill also held a mortgage, even if acquired in the future.

In addition, Gatlin stated that Winter Hill Bank intended that the properties be cross-

collateralized and that the mortgages contained dragnet clauses to cross-collateralize present

and future acquired property of the Debtor in which it had a security interest. He added that

the 2011 amendments were executed to assist the Debtor and that the reiteration of the pre-

existing cross-collateralization language was done with "the intent of avoiding any confusion

due to the amendments and to be a 'belt and suspenders' method of ensuring that said cross-

collateralization language continued."

## IV. POSITIONS OF THE PARTIES

A. <u>LDFC</u>

Although LDFC concedes that Massachusetts recognizes and enforces dragnet clauses, it, citing <u>Sunset Hollow Props., LLC v. The Bank of Western Massachusetts (In re Sunset Hollow Props., LLC)</u>, 359 B.R. 366 (Bankr. D. Mass. 2007), maintains that "[u]nder Massachusetts law, future advances, made pursuant to a dragnet clause in a senior lien instrument . . . do not enjoy priority over an intervening lien . . . without the possibility of such priority being made explicit in the original lien instrument." <u>Id.</u> at 378 (citing <u>NAB Asset Venture III, L.P. v. Brockton Credit Union</u>, 62 Mass. App. Ct. 181, 815 N.E.2d 606, 609 (2004)). LDFC states:

> Winter Hill's claim that it has an enforceable dragnet clause in its mortgage on 338 Market must fail. A dragnet clause may extend a mortgage security for other obligations of a mortgagor to a mortgagee, whether existing or subsequently created; however the intent of the parties, and more importantly the language employed by the drafter of the mortgage controls. <u>NAB Asset Venture III, L.P. v. Brockton Credit Union</u>, 62 Mass.App.Ct. at 183. . . . [T]he specific words employed fail to secure all other obligations, whether existing or subsequently arising. Accordingly, the LDFC maintains its priority to proceeds in 338 Market Street as second mortgagee.

LDFC adds:

> The language used in the mortgage is to be strictly construed against the drafter. <u>In re Moran</u>, [163 B.R.] at 16. The language in Winter Hill's mortgage is uncertain and confusing. It fails to put future lenders on notice that it intended to collateralize other obligations that Mr. Natale had with Winter Hill or which it may obtain in the future. In fact, the current debtor, Mr. Natale, did not treat Winter Hill's 338 Market Street mortgage as containing a dragnet clause.

\*\*\*

12

> The specific words used in Winter Hill's mortgage fall short of accomplishing its goal of cross collateralization. . . . It does not, by its plain language, express a clear intent to extend Mr. Natale's obligation under this agreement to other obligations that may exist or that may arise in the future.

LDFC also contends that Winter Hill Bank's mortgage documents relating to the Gorham Street properties do not contain any language specifically identifying pre-existing collateral, so that Winter Hill Bank's dragnet clause with respect to the Market Street property arguably would not extend to the Gorham Street properties. Citing In re Bass, 44 B.R. 113, 115 (Bankr. D.N.M. 1984), it maintains that a dragnet clause is more likely to be enforced when applied to future advances than to unidentified debt existing at the time of the mortgage and that the subsequent debt asserted by the mortgagee to be secured by the dragnet clause, arguably is dissimilar and sufficiently unrelated to the original debt.

LDFC further argues that amendments to the Market and Gorham Street mortgages entered into with Winter Hill Bank in 2011 should have no impact on its security interests in the respective properties. Because LDFC recorded its mortgage on 338 Market Street in August of 2003 and recorded its mortgages the  Gorham Street properties in September of 2006, it states that Winter Hill Bank was on notice of LDFC's position as second mortgagee in the respective properties in 2011.  It contends that Massachusetts law makes it clear that an instrument purporting to secure all other obligations, whether existing or arising at some point in the future, must be recorded, thereby putting future lien holders on notice pursuant to Mass. Gen. Laws ch. 183, § 28B concerning open-ended mortgages.  It suggests that Winter Hill Bank's steps to amend its mortgages in 2011 to ensure that the language comported with that identified with enforceable cross-collateralization agreements is evidence of its

apprehension about the enforceability of its dragnet clauses.

Finally, LDFC asserted at the February 12, 2014 hearing that the Winter Hill Bank mortgage on the Market Street property was granted by the Debtor, individually, and that its mortgage on 30-36 Gorham Street property was granted by Mill City Properties, LLC. Therefore, it argued, the dragnet clause in the Market Street mortgage, which secured the Obligations of the "Borrower" (the Debtor), should not extended to the obligations of a "separate and distinct entity" (Mill City Properties, LLC).

B. Winter Hill Bank

Winter Hill Bank states that the Debtor granted a mortgage to it containing a pledge of the property located at 338 Market Street as collateral for the "Obligations," which were defined as being, in part, other mortgages to Winter Hill Bank, even those not yet existing at the time of the 338 Market Street mortgage.  It maintains that the language was plain and constituted an enforceable dragnet clause, as the parties intended as evidenced by the cross-collateral language in the 338 Market Street Commitment Letter. In its view, the dragnet clause put LDFC and all other future lenders on notice because the mortgage was recorded six months before LDFC recorded its second mortgage on 338 Market Street, and about three years and seven months before LDFC recorded its second mortgages on the Gorham Street properties.  Additionally, in Winter Hill Bank's view, the Debtor granted mortgages to it on the Gorham Street properties as "Collateral," defined, in part, as "any other property of the Mortgagor in which the Mortgagee may in the future be granted an interest" - - clear language constituting a dragnet clause, as intended by the cross-

14

collateralization language in the Commitment Letter.  It adds that the dragnet clause put

LDFC and all future lenders on notice.

Citing, *inter alia*, In re Moran, 163 B.R. at 14, and Mass. Gen. Laws ch. 183, § 28B,

Winter Hill Bank argues that the extent of its security must be determined by the language

utilized in the mortgage and that the usual rule in Massachusetts is that, where the wording

of the contract is unambiguous, the contract must be enforced according to its terms. *See*

Pride Hyundai, Inc. v. Chrysler Fin. Co., L.L.C., 369, 369 F.3d 603, 616 (1st Cir. 2004).

According to Winter Hill Bank, dragnet clauses are enforceable where a subsequent

mortgagee has knowledge of the dragnet clauses' existence.  It argues that LDFC had such

actual knowledge because its Market Street mortgage containing the dragnet clause was

recorded. Moreover, it cites the Debtor's deposition testimony that, when he filled out the

loan applications for LDFC, he told LDFC about the existence of Winter Hill's first mortgages

regarding the Market and Gorham Street properties.

Winter Hill Bank adds that the intent of Winter Hill Bank and the Debtor was clear

that the properties were to be cross-collateralized.  Not only was the cross-collateralization

set forth in the Commitment Letters and in the recorded mortgages, the Debtor testified at

his deposition that he understood the properties to be cross-collateralized. Moreover, Gatlin

also stated in his affidavit that it was always the intent of Winter Hill Bank, as far back as the

time the Debtor applied for his first mortgage with it, and through the entire loan process,

that all of the Debtor's properties, whether held at the time of that first mortgage application,

or thereafter acquired at anytime in the future, would be cross-collateralized to ensure that,

15

in the situation where one of the Debtor's properties did not have enough equity to cover the loan amount, Winter Hill Bank could collect the deficiency from another property owned by the Debtor for which Winter Hill Bank also held a mortgage.

Winter Hill Bank urges the Court to reject LDFC's argument that the dragnet clause is unenforceable because it lacks specificity.  Winter Hill Bank cites In re Serra No. 04-41076, 2006 WL 3354011 (Bankr. D. Mass. Nov. 17, 2006), a case in which the language used in the dragnet clause interpreted by the court is similar to the language employed by Winter Hill Bank in its mortgage on the Market Street property (i.e, "The mortgage is security for the payment of the aforesaid obligation and all other direct and contingent liabilities of the mortgagor hereof to the holder hereof due or to become due, whether now existing or hereafter contracted.").  Winter Hill Bank argues that dragnet clauses are by design intended to secure an unspecified amount of future advances.  It also points to Mass. Gen. Laws ch. 106, § 9-204 for support with reference to the enforceability of after acquired property clauses.

Winter Hill Bank also argues that a sophisticated lender such as LDFC should have understood what the language of the dragnet clause meant, or, at least, asked Winter Hill Bank or the Debtor about it, adding "[t]he language in the 338 Market mortgage securing Obligations 'hereafter arising' has no purpose if it is not a dragnet clause."  It also contends that the existence of a disputed interpretation does not create an ambiguity in the contract language where none exists, relying upon Suffolk Constr. Co., Inc. v. Illinois Union Ins. Co., 80 Mass App. Ct. 90, 94, 951 N.E.2d 944, 948 (2011).

16

Winter Hill Bank maintains that its reiteration of the cross-collateralization in the 2011 amendments did not undo the dragnet clause.  It insists that its intent was to ensure that there was no confusion as to the existence of the cross-collateralization.  It also points to the Debtor's deposition testimony that the amendments were to get him "back on track." Finally, Winter Hill Bank states that LDFC's position that the Debtor's refinancing of the Gorham Street properties in 2006 defeated its cross-collateralization is untenable.  It notes that LDFC's second mortgage on the Gorham Street properties came after its 2006 mortgages on the Gorham Street properties, such that the Winter Hill Bank's mortgages executed pursuant to the refinancing of those properties have priority over LDFC's mortgages.

With respect to LDFC's argument concerning the separate and distinct entities which granted the Market Street and 30-36 Gorham Street mortgages, Winter Hill Bank emphasizes that the Debtor personally guaranteed the obligations of Mill City Properties, LLC with respect to the 30-36 Gorham Street note and mortgage.

## V. DISCUSSION

The United States Bankruptcy Appellate Panel of the First Circuit succinctly set forth the standard for determining summary judgment motions in <u>Weiss v. Wells Fargo Bank, N.A. (In re Kelley)</u>, 498 B.R. 392 (B.A.P. 1st Cir. 2013).  It stated:

> "In bankruptcy, summary judgment is governed in the first instance by Bankruptcy Rule 7056." <u>Desmond v. Varrasso (In re Varrasso)</u>, 37 F.3d 760, 762 (1st Cir.1994). "By its express terms, the rule incorporates into bankruptcy practice the standards of Rule 56 of the Federal Rules of Civil Procedure." <u>Id.</u>; *see also* Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56. "It is apodictic that summary judgment should be bestowed only when no genuine issue of material fact exists and the movant has successfully demonstrated an entitlement to judgment as a matter of law." <u>In re Varrasso</u>,

> 37 F.3d at 763 (citing Fed. R. Civ. P. 56(c)). The "mere existence of some
> alleged factual dispute between the parties will not defeat an otherwise
> properly supported motion for summary judgment; the requirement is that
> there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc.,
> 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In re Kelley, 498 B.R. at 397 (footnote omitted).  As stated above, the parties agree that the

material facts necessary to determine the Cross Motions are not in dispute and thus summary

judgment is appropriate.

At the outset, the Court notes that the dragnet clause contained in Winter Hill Bank's

mortgage on Market Street is unambiguous on its face and that, ordinarily, extrinsic evidence

would not be required to ascertain its meaning.  Here, however, no party objected to the

Court's consideration of, or moved to strike, the extrinsic evidence included in the summary

judgment record.  Moreover, it appears that Winter Hill Bank's Market Street mortgage is not

an integrated document and thus extrinsic evidence is admissible to elucidate the meaning

of its terms.  See Schinkel v. Maxi–Holding, Inc., 30 Mass. App. Ct. 41, 46, 565 N.E.2d 1219

(1991)("A finding that the writing is not an integrated statement of the parties' agreement

can open the way for proof of other elements of the agreement."); ITT Corp. v. LTX Corp.,

926 F.2d 1258, 1264 (1st Cir. 1991)("We recognize under Massachusetts law that, in order to

utilize extrinsic evidence of the parties' intent, a court need not invariably find facial

ambiguity."). Accordingly, the Court will consider the extrinsic evidence proffered by Winter

Hill Bank to elucidate the meaning of the dragnet clause, although it notes that such extrinsic

evidence merely supports the Court's conclusions which are otherwise based on the

unambiguous language of the Winter Hill Bank Market Street mortgage dragnet clause and

does not contradict the terms of that mortgage.

In <u>In re Serra</u> No. 04-41076, 2006 WL 3354011 (Bankr. D. Mass. Nov. 17, 2006), the

bankruptcy court succinctly stated Massachusetts law regarding dragnet clauses.  It stated:

> Massachusetts recognizes mortgage provisions that draw in future, unspecified obligations. *See generally* 28 Mass. Prac. § 9.16 (2006). This is often accomplished by structuring the transaction in one of three common ways: (1) flexible mortgage; (2) open-end mortgage; or (3) dragnet clause.
>
> ***
>
> Massachusetts courts generally enforce dragnet clauses. *See generally* <u>Everett Credit Union v. Allied Ambulance Services, Inc.</u>, 12 Mass. App. Ct. 343, 424 N.E.2d 1142 (1981); <u>Financial Acceptance Corp. v. Garvey</u>, 6 Mass. App. Ct. 610, 380 N.E.2d 1332 (1978). Massachusetts courts consider (1) the intent of the parties and (2) the language employed in the mortgage. <u>Garvey</u>, 6 Mass. App. Ct. at 613, 380 N.E.2d 1332. *See also* <u>Ballarino</u>, 180 B.R. at 346. They can rely solely on the language used in the instrument, or the lack thereof, in determining the parties' intent and need not consider other evidence. *See* <u>Allied Ambulance</u>, 12 Mass. App. Ct. at 347, 424 N.E.2d 1142. Massachusetts courts also consider whether the later-acquired debt is of the "same general kind as that secured by the mortgage," including whether the additional amounts were all part of a continued course of dealing between the lender and the individual or business. <u>Garvey</u>, 6 Mass. App. Ct. at 613–4, 380 N.E.2d 1332.

<u>Serra</u>, 2006 WL 3354011 at*1-2 (footnotes omitted).[9]  The court in <u>Serra</u>, added:

> Bankruptcy Courts use the state law test when considering dragnet clauses. *See* <u>In re Chiodetti</u>, 163 B.R. 6 (Bankr. D. Mass. 1994); <u>In re Moran</u>, 163 B.R. 11 (Bankr. D. Mass. 1994). In <u>Chiodetti</u>, the court held that the mortgage did not secure a later note, specifically finding that although the mortgage referred to other obligations, it did not contain any language referring to indebtedness "hereafter arising, as provided in the note or notes given therefore . . ." as in <u>Garvey</u>, or to the real estate being security for all direct and contingent

---

[9] In <u>Garvey</u>, the Court stated: "[t]he guiding principal in construction of the dragnet clause is the determination of the intent of the parties in view of the particular circumstances and the language employed in the mortgage." 6 Mass. App. Ct. 610, 613, 380 N.E.2d 1332 (emphasis supplied)."

> liabilities "whether now existing or hereafter contracted" as in <u>Allied
> Ambulance</u>. <u>Chiodetti</u>, 163 B.R. at 9. *Accord* <u>Moran</u>, 163 B.R. at 16 (holding that
> the mortgage did not secure future advances because it lacked a dragnet
> clause). The court stressed that "Massachusetts law permits interpretation of
> the mortgage alone to discover the intention of the parties and the extent of the
> security." <u>Chiodetti</u>, 163 B.R. at 10.

<u>Serra</u>, 2006 WL 3354011 at *2.  Dragnet clauses generally contain language similar to the

following: "[T]his mortgage is security for the payment of the aforesaid obligation and all

other direct and contingent liabilities of the mortgagor hereof to the holder hereof due or to

become due, whether now existing or hereafter contracted." <u>Id.</u> at (citing Arthur L. Eno,

William V. Hovey and Michael Pill, *Mortgage Providing for a Dragnet Clause*, 28B Mass. Prac.

§ 51.21 (4th ed. 2013)).

In <u>Serra</u>, the debtors moved to reopen their Chapter 7 bankruptcy case to obtain a

discharge of a note executed in 2006 after the entry of the discharge but before the case was

closed. The court construed the following language:  *to secure the performance of our guaranty*

*of even date . . . in the amount of UNLIMITED FUNDS to secure the payment of all or any other*

*liability, direct or indirect, of the Mortgagor or any of them to the holder or holders hereof, whether*

*now due or hereafter due or contracted, . . .*" <u>Id.</u> at *1 (emphasis in original).  The court noted that

the debtors, like LDFC in this case, argued that the mortgage they executed was not valid

because "it was for 'unlimited funds' and thus lacked definite terms," and because the

mortgage did not secure the 2006 note, which was executed years after the bankruptcy filing,

as well as after the execution of notes in 2001 and 2003.  The court stated:

> [T]he phrase "unlimited funds" was used within the context of a so-called
> "dragnet clause" so the more precise issue is whether such a clause secures the
> Debtors' later-acquired debt. The Court rules that it does because *a dragnet*

20

> *clause by design secures an unspecified amount of future advances.* The Court also
> rules that the post-petition timing of the 2006 Note is not relevant to its
> decision; state law, not the Bankruptcy Code, determines the reach of a
> dragnet clause. Thus, the Court rules that the Mortgage is valid and secures
> the 2006 Note.

Id. (emphasis supplied).

Although dragnet clauses are enforceable under appropriate circumstances, courts narrowly construe them because they can be used oppressively or as a device for fraud and because they are generally "boilerplate" language inserted in loan documents drafted by the lender without negotiation and frequently without the borrower's knowledge.  *See* In re Ballarino, 180 B.R. 343, 347 (D. Mass. 1995).  In Ballarino, the court refused to enforce the following dragnet clause:  "'This mortgage shall also secure any other loans, indebtedness, liability or liabilities, direct or indirect, of the Mortgagor to the Mortgagee or the holder or holders hereof, due or to become due or which may hereafter arise or be cont[r]acted.'" Id. at 346.  It did so for two reasons.  First, the dragnet clause appeared in a home mortgage as opposed to a commercial mortgage.  Second, the court ruled that the mortgage at issue did not explicitly designate the obligations created as joint and several, either in the dragnet clause or in any other clause, thus warranting equitable relief from the dragnet clause.  Id. at 347. *See also* Everett Credit Unition v. Allied Ambulance Servs., Inc., 12 Mass. App. Ct. 343, 424 N.E.2d 1142 (1981).

Based upon the principles of law set forth in Serra, the Court concludes that the dragnet clauses in Winter Hill Bank's mortgages is enforceable.  Moreover, the Court concludes that the decision in Ballarino is easily distinguishable from the facts of this case.

In this case, the relationships among the parties involved commercial transactions, and the parties were sophisticated in their business dealings. LDFC cannot credibly argue that it was unaware of the provisions of the recorded mortgages on the Market Street and Gorham Street properties as those mortgages were on record and contained language typically used in enforceable dragnet clauses. The language of the Market Street mortgage dragnet clause unambiguously defined "Obligations" as those of the Debtor to Winter Hill Bank "now existing or hereafter arising, direct or indirect . . . ." Moreover, the Debtor testified in his deposition that he informed LDFC of the existence of the first mortgages on the Market Street and Gorham Street properties.

LDFC relies upon NAB Asset Venture III, L.P. v. Brockton Credit Union, 62 Mass. App. Ct. 181, 815 N.E.2d 606 (2004), in support of its position. In NAB Asset Venture III, L.P., the borrowers, in 1966, obtained a $10,000 loan from Brockton Credit Union ("BCU") and secured the debt with a mortgage. Fourteen years later, in 1980, they obtained a second mortgage in the amount of $180,000 from Massachusetts Bank and Trust Company ("MBTC"). Four years later, they obtained another loan from BCU for $66,000 which replaced the 1966 loan and contained a dragnet clause. Although MBTC agreed to subordinate its 1980 loan to the 1984 loan, when in 1989 the borrowers obtained an additional loan in the amount of $35,000 from BCU, for which there was no subordination agreement, NAB Asset Venture III, L.P., who had become the owner of the 1980 MBTC loan and foreclosed against the property, commenced an action to determine whether the 1989 BCU mortgage was senior to its 1980 mortgage. On appeal, the court affirmed the trial court's

22

ruling in favor of NAB that the dragnet clause in BCU's 1984 mortgage did not give it

priority as to its 1989 mortgage.  The appellate court stated:

> In the present case, however, the issue is not whether, as between the borrower
> and the lender, the lender may look to the property mortgaged under a
> dragnet clause as security for later debt. Instead, the question is of the priority
> of advances secured under the dragnet clause but made after the creation of
> an intervening lien. Resolution of that question was expressly reserved in
> Everett Credit Union v. Allied Ambulance Servs., Inc., 12 Mass.App.Ct. at 345
> n. 2, 424 N.E.2d 1142.

> Different considerations come into play when an intervening lender acquires
> a security interest prior to advances sought to be brought within the dragnet
> clause. Everett Credit Union v. Allied Ambulance Services, Inc., 12 Mass. App.
> Ct. at 346, 424 N.E.2d 1142. ("Mortgages covering future advances are usually
> held valid in Massachusetts, at least where such advances are made prior to
> the intervention of other liens"). See Barnard v. Moore, 90 Mass. 273, 8 Allen
> 273, 274 (1864) ("A mortgage may be valid, having a stipulation in it for
> securing future advances and liabilities on the part of the mortgagee. If such
> advances have been made or liabilities assumed before other interests have
> legally intervened, they will be secured by the mortgage"). Contrast Debral
> Realty, Inc. v. Marlborough Coop. Bank, 48 Mass.App.Ct. at 94, 717 N.E.2d
> 1023 (no intervening lien).

62 Mass. App. Ct. at 184-85, 815 N.E.2d at 608-609.  Based upon the facts of the case, the court

held:

> Applying both the principle of narrow construction of dragnet clauses and that
> of the general priority of intervening lienors, we conclude that if lenders
> intend to retain priority under a dragnet clause for future advances as against
> intervening lienors, the language effecting that intent should be explicit.
> Accordingly, to the extent that we are concerned with the intent of the parties
> in resolving the question in this case, we are concerned not with the intent of
> the borrower and lender in the 1984 BCU loan transaction, but with the intent
> of BCU and MBTC as reflected in MBTC's agreement to subordinate its 1980
> mortgage to BCU's 1984 mortgage. The $66,000 1984 mortgage to BCU, with
> a dragnet clause, replaced a pre-existing $10,000 mortgage held by BCU that
> did not contain a dragnet clause.The language of MBTC's subordination
> agreement makes no reference to the dragnet clause contained in the 1984

23

> mortgage, although it subordinates priority "as against the indebtedness
> secured by the first mortgage above referred to." Because the MBTC
> subordination agreement initially uses the phrase "first mortgage" to describe
> the 1966 BCU mortgage, and subsequently uses the phrase "a new first
> mortgage" to describe the 1984 mortgage to BCU, the agreement to
> subordinate to "the indebtedness secured by the first mortgage above referred
> to" does not demonstrate MBTC's intent to subordinate to future advances.

NAB Asset Venture III, L.P., 62 Mass. at 185-86, 815 N.E.2d at 609-610 (footnote omitted).

The court noted that the stated purpose of MBTC's subordination to BCU's 1984 mortgage
was to permit the 1984 mortgage to retain the seniority of the 1966 mortgage that was being
replaced.

The Court finds that NAB Asset Venture, III, L.P. is distinguishable from the present
case, particularly where LDFC expressly agreed in the Market Street and Gorham Street
second mortgages that its mortgage was subject to the prior mortgages of Winter Hill Federal
Bank and there were  no advances secured under the dragnet clause after LDFC's second
mortgages.  LDFC was not an "intervening" lienholder.  Rather, LDFC took subject to first
mortgages that contained dragnet clauses and were cross-collateralized.

The present case is similar to Debral Realty, Inc. v. Marlborough Co-op Bank, 48 Mass.
App. Ct. 92, 717 N.E.2d 1023 (1999), review denied, 722 N.E.2d 977 (1999), a case in which the
court enforced a dragnet clause in favor of a first mortgagee with respect to two properties
on which there were second mortgages. The facts are as follows:

> In a series of loan transactions which took place between 1980 and 1989,
> Richard J. Budryk and his wife, Silva Y. Budryk (the Budryks), obtained
> mortgage-backed financing, first from the Marlborough Cooperative Bank
> (bank) and subsequently from Debral Realty, Inc. (Debral). All the notes and
> mortgages concerned the Budryks' acquisition of income-producing property
> situated on Hastings Street and West Main Street in Marlborough. The

> Hastings Street transaction was first in time; the West Main Street transaction
> occurred some five years later. The Budryks thereafter defaulted on their loan
> obligations, and Debral, the junior mortgagee, foreclosed on its mortgages on
> the properties. Although Debral remained current in its mortgage payments
> to the bank on the Hastings Street property, it defaulted as to West Main
> Street. The bank asserted a right to foreclose on both properties on the basis of
> a "dragnet" clause contained in the Hastings Street mortgage. Debral then
> brought the present action, claiming that the foreclosure was wrongful and in
> violation of G.L. c. 93A, § 11. . .

48 Mass. App. Ct. at 92-93, 717 N.E.2d at 1024-25.  Specifically, on March 3, 1980, the Budryks

granted the bank a mortgage on the Hastings Street property to secure a note of the same

date. The mortgage contained a dragnet clause which provided that it was to secure payment

of the note executed that same date and "'also to secure the payment of all other

indebtedness of the mortgagor to the mortgagee hereafter arising.'"  48 Mass. App. Ct. at 93,

717 N.E.2d at 1025.  Five years later, the Budryks executed and delivered a note to the bank

secured by a first mortgage on the West Main Street property, which made no reference to

the Hastings Street property.  In 1989, Debral became a junior mortgagee with respect to both

properties.   48 Mass. App. Ct. at 93-94, 717 N.E.2d at 1025.  Debral foreclosed its mortgages

in 1991, subject to the bank's mortgages and became the owner of the properties.  It failed to

make monthly payments to the bank on the West Main Street mortgage and the bank

declared both its mortgages in default and commenced foreclosure proceedings.   48 Mass.

App. Ct. at 94, 717 N.E.2d at 1025.  The court determined that neither property involved the

borrowers' residence and the notes on the two properties were for the same purpose of

financing property to produce income for the borrowers. The court held:

> Based upon the above-discussed authorities and the undisputed evidence (the
> mortgages and notes of even dates signed by the Budryks in connection with

25

their purchase of income-producing property in which they did not reside), we
conclude that the West Main Street debt was covered by the dragnet clause in
the Hastings Street mortgage and that the bank's foreclosure upon Debral's
default was not wrongful.

48 Mass. App. Ct. at 98, 717 N.E.2d at 1028.  In sum, the court ruled that the "dragnet" clause

in the senior mortgage on the property in default allowed the senior mortgagee to foreclose

on both properties.  As in that case, there is no evidence here of unfairness or oppressiveness

in the relationship between any of the parties.

The Court is unpersuaded by the argument advanced by LDFC at the February 12,

2014 hearing, that the dragnet clause in Winter Hill Bank's Market Street mortgage secures

only the obligations of the Debtor as the "Borrower" as opposed to those of Mill City

Properties, LLC which executed the mortgage on 30-36 Gorham Street.  The language of the

dragnet clause in the Winter Hill Bank Market Street mortgage contained in the definition

of "Obligations" expressly extends to all obligations of the Borrower (the Debtor) to Winter

Hill Bank "now existing or hereafter arising, *direct or indirect* . . ." As the Debtor personally

guaranteed the obligations of Mill City Properties, LLC to Winter Hill Bank for the Gorham

Street loans, his obligations thereunder were "indirect" and thus within the scope of the

dragnet clause.

**VI. CONCLUSION**

In view of the foregoing, the Court shall enter an order granting summary judgment to Winter Hill Bank on its Cross-Motion for Summary Judgment and denying summary judgment to LDFC. Winter Hill Bank's counterclaim is moot.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  April 24, 2014